Filed 9/20/16  In re William M. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re WILLIAM M., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v. HEATHER P., Defendant and Appellant. | F072901 (Super. Ct. No. 14CEJ300106-1) **OPINION** |

APPEAL from an order of the Superior Court of Fresno County.  Brian M. Arax, Judge.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Brent C. Woodward, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Heather P. (mother) is appealing from a juvenile court order terminating her parental rights to her son, William M., currently four years of age. Mother contends the juvenile court erred in denying her petition under Welfare and Institutions Code section 388[1] and in its failure to find the beneficial relationship exception to adoption applicable pursuant to section 366.26, subdivision (c)(1)(B)(i). We affirm.

## FACTUAL AND PROCEDURAL HISTORY

*Detention*

In March 2014, two-year-old William came to the attention of the Fresno County Department of Social Services (department) after William's father[2] was arrested for physically abusing William. Mother, who did not live with father, arrived at father's house at the time of the arrest, but William was not released to her because of a 2013 family court order which stated mother had only supervised visitation with William.

According to mother, she walked out on father and William in October of 2012 due to father's abuse of her. William was 10 months old at the time. Father filed for custody of William and, in August of 2013, was given full custody and mother given only supervised visits. Mother, who lived with her own parents, told the social worker she could not attend all of the visits with William because she could not always afford the fee charged by the visitation center.

The department filed a section 300 petition, alleging father physically abused William and had a history of doing so. At the detention hearing April 3, 2014, the juvenile court ordered twice a week supervised visitation for both mother and father. Both parents reported no known Indian ancestry.

---

**1** All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

**2** Father is not a party to this appeal.

2.

*Jurisdiction/Disposition*

The report prepared in anticipation of jurisdiction/disposition stated mother was attending supervised visits with William and that the visits were going well. Mother had no prior child welfare or criminal history.

By the time of the contested jurisdiction and disposition hearing July 3, 2014, father had been released from jail and was now living with mother. Mother reported that father abused her and spanked William while in her presence. Because mother was unable to protect William from father and because of mother's continued relationship with father, the department recommended William not be placed with mother at this time. Mother's visits with William were still supervised and were still going well. William continued in a placement with a paternal aunt and uncle.

The juvenile court sustained the section 300 petition and found mother was a non-offending, non-custodial parent. Reunification services were ordered for both mother and father. Mother was ordered to participate in parenting classes, domestic violence counseling, drug testing, an evaluation for substance abuse and necessary treatment, and a mental health evaluation. Visitation remained supervised as previously ordered.

*Six-Month Review*

In the report prepared in anticipation of the December 2014 six-month review hearing, the department reported mother and father were no longer living together, as father reported he was homeless. Mother was complying with her case plan: she completed a parenting program and was scheduled to begin another; she completed a domestic violence program for victims; she participated in random drug testing, all of which were negative; and her substance abuse evaluation concluded she was not in need of treatment. Mother's mental health evaluation recommended therapy, and she was participating in individual therapy for depression and anxiety.

Visitation for mother and William had been liberalized by the department to unsupervised visits, twice a week for four hours. William's caregiver reported that William was having a difficult time when he returned from visits with mother. He regressed in toilet training, hid behind furniture, was very clingy and returned from visits dirty.

At the six-month review hearing December 11, 2014, mother's visitation was continued as unsupervised, but not advanced to liberal at the time, although the issue could be revisited. The juvenile court ordered the department to continue to provide reunification services, but vacated the prior order requiring mother to drug test.

In an addendum report, the department stated it had met to discuss progressing visits and setting up a transition plan for William and mother. At the meeting, mother reported she received special education from kindergarten through 12th grade due to a learning disability, which made it difficult for her to process information. The department had concerns about liberalizing visitation until mother could demonstrate she could take care of William without assistance from her own mother. William was found to have a speech delay and was eligible for services through Central Valley Regional Center (CVRC).

At the January 13, 2015, continued six-month review hearing, the juvenile court found continued placement necessary, current placement appropriate, and that the department had offered and provided reasonable services. The juvenile court found mother's progress moderate and ordered reunification services continued.

*Progress Report*

In March of 2015, the department filed an interim review report stating it met with the parents in February of 2015, to again address visitation. William's caregiver reported mother was allowing father to have contact with William during mother's unsupervised visits, a claim both parents refuted. Mother admitted she went to a Valentine's Day dance with father, but claimed she was not in a relationship with him. The social worker

4.

observed that mother appeared to be intimidated and uncomfortable in father's presence during that meeting. However, at a court hearing in January, mother was seen in the waiting area sitting on father's lap.

The report stated that, during visitation, mother was attentive to William's needs and William appeared comfortable with mother. By this time, mother's unsupervised visits with William increased to eight hours three days a week.

At the March review hearing, the juvenile court ruled all prior orders remain in full force and effect.

*12-Month Review*

The Court Appointed Special Advocate (CASA) submitted a report for the 12-month review hearing in May of 2015. The CASA observed three visits between mother and William and reported mother had a hard time disciplining William. The CASA did not think it in William's best interest at this time to have overnight visits with mother.

The department reported that, although mother completed all of her court-ordered services, it did not think mother could keep William safe as she continued to be in an on and off relationship with father. At a department meeting in April of 2015, mother said she needed additional domestic violence support so she could "say no" to father. William's caregiver reported that mother brought William back sick after visits, and was also returning him early and not keeping him for the full eight hours. The care provider seemed to think mother was more concerned with what father was doing than how William was doing.

William was receiving speech therapy services though school. The social worker reported mother continued to have regular and consistent unsupervised visits with William three days a week.

Mother's therapist reported she was participating in individual therapy, which was going well, but they had not yet addressed the issue of domestic violence.

At the July 2015 contested 12-month review hearing, mother testified she was not in a romantic relationship with father and had not been since 2012. Although mother acknowledged she had been with father at a Valentine's Day dance at his sober living facility, she had stayed only an hour and talked to father about William. The only contact mother had with father since then was at the department's office. Mother had now completed a second domestic violence program and was in the process of obtaining a restraining order against father. She felt she was now better able to understand her "boundaries."

Mother reported she was visiting William on the weekends, but not during the week because he attended school. Mother acknowledged she could not handle overnight visits at this point, unless she had help from her own mother. Mother was receiving services through the CVRC and had enrolled in another parenting program.

The social work supervisor testified one of the department's concerns was mother's inability to protect herself and William. The supervisor described mother as having "a lot of fears." According to the supervisor, the department worked hard with mother during her visits with William in learning to parent, both with a parent coach and parent partner, as well as the CASA.

The juvenile court stated it did not believe mother benefitted from the provided services to the degree that there would be a substantial probability of her safely parenting William. It found mother's progress to be "minimal to moderate" and terminated reunification services for both parents. A section 366.26 selection and implementation hearing was scheduled for November 2015. Visitation was reduced to two times per month, supervised. Writ advisements were given both mother and father in court.

6.

*Section 388 Petition*

In December of 2015, mother filed a section 388 petition requesting return of William to her custody, extended visitation and/or reinstatement of reunification services. Mother alleged a change of circumstances because she completed additional domestic violence counseling, was participating in additional parenting classes, maintained separation from father, and participated in independent living skills and CVRC services. Mother alleged it was in William's best interests that he be returned to her custody or to reinstate reunification services because William demonstrated a bond with mother during visits and would benefit from preserving their relationship.

The department's response to the section 388 petition recommended the petition be denied because mother had not ameliorated the condition which prompted the department to intervene and, while she had previously completed reunification services, she had not benefited from them.

A hearing on the section 388 petition was set for the same day as the section 366.26 hearing.

*Section 366.26 Report*

In the report filed in anticipation of the section 366.26 hearing, the department stated William was meeting all of his goals in speech therapy at school. He was said to be playful and friendly, enjoyed his caregiver family, and loved to go to school. William had been in his current placement, with a paternal aunt and uncle, for about 17 months. The caregivers were meeting William's physical, developmental and emotional needs and wished to adopt him.

The report stated mother consistently visited William and the visits were appropriate. Mother was always on time, brought snacks, closely supervised William and was very attentive to him. Mother was overall very nurturing to William. She encouraged him to repeat words, colors, and shapes. William called mother "mom," and smiled when she took pictures of him. At the end of the visits, mother asked for hugs and

7.

kisses, and William reciprocated the affection without a problem. At the end of each visit, William willingly left with his care providers after he said goodbye to mother.

The social worker opined that William did not recognize mother as a parental figure and, despite mother's consistent visits, she had been unavailable to provide for William's daily needs. The social worker recommended parental rights be terminated.

*Section 388 and Section 366.26 Hearing*

The combined section 388 and section 366.26 hearing was held December 17 and 18, 2015. Mother testified she had not been in contact with father since they were in court together when reunification services were terminated in July 2015. Mother tried to get a restraining order against father, but it was denied by the court because "there was no recent information" requiring the order. After reunification services were terminated, mother attended additional domestic violence and healthy relationship classes in which she stated she learned "boundaries." After she completed those classes in October of 2015, she enrolled and completed another parenting class, as well as independent living skills classes she was still participating in. Mother was referred to the programs through CVRC services. Mother lived with her own parents and William had his own room there.

Mother believed William had a strong connection to her and that he would be angry when she was not there to see him. She described William as happier to see her, more cheerful, wanting to be closer to her while they were doing activities, and more communicative.

Mother's counsel argued the section 388 petition should be granted but, if denied, asked the juvenile court to apply the beneficial parent-child exception to termination of parental rights and order a legal guardianship instead of adoption.

The juvenile court denied mother's section 388 petition based on its concern that mother's judgment was significantly impaired. While it found mother's efforts "wonderful" and "admirable," it noted she still had a "child-like quality" to her and had not resided independently, but relied on her own parents for her home and transportation.

8.

The court was concerned with mother's inability to separate herself from father, even though he had abused her, he abused William, he was married to another woman when mother resumed her relationship with him, and he had not successfully participated in services. The court stated it did not find mother's testimony to be particularly insightful regarding what she learned in her programs, noting her testimony was generalized, not detailed, and simplistic in nature. The court found mother's circumstances were only "changing," and it was not in William's best interest to return him to mother or to reinstate reunification services.

Addressing the section 366.26 issues, the juvenile court found by clear and convincing evidence that William was adoptable. As for the beneficial parent-child relationship exception, the court found mother successfully visited William and was loving and nurturing to him, but it described the relationship as a friendly visitor situation and that it did not outweigh the benefits of permanency through adoption. The court terminated both mother and father's parental rights.

## DISCUSSION

### I. SECTION 388 PETITION

Mother contends the juvenile court abused its discretion in denying her section 388 petition filed five months after reunification services were terminated. Mother contends she showed by a preponderance of the evidence that there was a change of circumstance or new evidence and that it was in the best interests of William to reinstate reunification services. We find no error.

*Applicable Law*

A petition to modify a juvenile court order under section 388 must allege facts showing new evidence or changed circumstances exist, and that changing the order will serve the child's best interests. (§ 388, subd. (a)(1).) The petitioner has the burden of

proof by a preponderance of the evidence. (Cal. Rules of Court, rule 5.570(h)(1)(D).)[3] In assessing the petition, the juvenile court may consider the entire history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

We review the denial of a section 388 petition after an evidentiary hearing for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) Where there is conflicting evidence, we reverse only if the evidence compels a finding for the appellant as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527-1529.)

The best interests of the child are of paramount consideration when, as here, a section 388 petition is brought after termination of reunification services. (*In re Stephanie M., supra,* 7 Cal.4th at p. 317.) In assessing the best interests of the child at this juncture, the juvenile court's focus is on the needs of the child for permanence and stability rather than the parent's interests in reunification. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.)

The "'escape mechanism'" provided by section 388 after reunification efforts have ceased is only available when a parent has completed a reformation before parental rights have been terminated. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528.) This is because, if a parent's circumstances have not changed sufficiently to permit placement of the child with that parent, reopening reunification "does not promote stability for the child or the child's best interests" when the child is otherwise adoptable. (*In re Casey D., supra,* 70 Cal.App.4th at p. 47.)

---

**3** Prior to January 1, 2015, this section was numbered California Rules of Court, rule 5.570(h)(1)(C).

*Analysis*

Here, at the hearing on the section 388 petition, the juvenile court went into what it described as an "incredibly long narrative" of the entire case in order to determine

> "whether circumstances have changed adequately enough and proven to a preponderance …. That it would then be in the best interest of this child to disrupt the permanence and the stability the child has found in the new home a[nd] the care that he has been given for such a long time and such a good portion of his life already, and as testified to today, the real progress that this child has made under the care of those care providers."

In considering the best interests of the child, the juvenile court stated it would consider mother's likelihood of successfully unifying her current efforts and fitness, her history, the gravity of the problem that led to William's detention, the strength of the bond between William and mother, and William's need for stability and continuity.

In addressing these factors, the juvenile court stated it had "serious concerns" about mother's fitness. While mother was "compliant, soft spoken and capable of accepting structure and thriv[ing] in it," the juvenile court found mother's judgment "significantly impaired." The juvenile court found mother's efforts "wonderful and admirable," but she had not resided independently, she relied on her own parents for her home and transportation, was not gainfully employed, and has had "significant judgment issues in her engagement with [father], and has allowed herself and her child to be abused." The juvenile court noted mother had, in the past, not been given custody of William, but only allowed supervised visitation. And while she successfully participated in services in the current case, she, for an extended period of time, continued to maintain a relationship with father, a man the juvenile court described as having "significant impulse control and violence tendencies," who was married to someone else at the time, who had abused her and William, and who himself had not successfully participated in services.

11.

The juvenile court found that, despite mother's participation in numerous domestic violence and parenting classes, mother was still not in a position to safely parent William. The juvenile court found mother's behavior and her testimony as to what she had learned "not … particularly insightful," but generalized and simplistic.  The juvenile court determined that, based on all that had transpired, "circumstances are changing in terms of further engagement in services; but not adequately changed and certainly nowhere near." The juvenile court even surmised that, based on what it had seen, it was not certain if mother could or would ever be able to get a to a point where she could safely care for William.

On the record before it, the juvenile court's finding of "changing" as opposed to "changed" circumstances, particularly in light of mother's relatively brief time apart from father and her continued need for supervision, was well within the juvenile court's discretion.  We reject mother's claim to the contrary.

## II. TERMINATION OF PARENTAL RIGHTS

Mother does not dispute William was adoptable.  Instead, she argues her parental rights were wrongly terminated because the juvenile court failed to apply the parent-child beneficial relationship exception.  Specifically, she contends the juvenile court applied the wrong legal test in determining the beneficial parent-child relationship exception inapplicable.  And she asserts the juvenile court erred in finding her relationship with William a "friendly visitor" relationship rather than the strong parent-child bond that it was.  We disagree.

*Applicable Law*

At a permanency planning hearing, once the juvenile court finds by clear and convincing evidence that the child is likely to be adopted within a reasonable time, the court is required to terminate parental rights and select adoption as the permanent plan, unless the parent shows that termination of parental rights would be detrimental to the child under one of several statutory exceptions.  (*In re Bailey J.* (2010) 189 Cal.App.4th

12.

1308, 1314 (*Bailey J.*).) One of these statutory exceptions is the beneficial relationship exception to adoption, which applies when it would be detrimental to the child to terminate parental rights if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "A parent asserting the parental benefit exception has the burden of establishing that exception by a preponderance of the evidence." (*In re J.C.* (2014) 226 Cal.App.4th 503, 529.) Once the juvenile court finds that a parent has met his or her burden to establish the requirements of the beneficial relationship exception, the juvenile court may choose a permanent plan other than adoption if it finds the beneficial relationship to be "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B); see *Bailey J., supra,* at p. 1314.)

The parent-child relationship exception occurs when a significant parent-child relationship is found to exist. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) The juvenile court must then engage in a balancing test, juxtaposing the quality of the relationship and the detriment involved in terminating it against the potential benefit of an adoptive family. (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425; see also *In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154-1156.)

*Standard of Review*

On appeal after a court has rejected a parent's efforts to establish the exception, two different standards of review apply. (See *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 (*K.P.*); *Bailey J., supra,* 189 Cal.App.4th at p. 1314.) Since the parent must show the existence of a beneficial parental relationship, which is a factual issue, we uphold a court's express or implied finding that there is no beneficial relationship if supported by substantial evidence. (*K.P., supra,* at p. 621; *Bailey J., supra,* at p. 1314.) More specifically, a challenge to a court's failure to find a beneficial relationship amounts to a contention that the "undisputed facts lead to only one conclusion." (*In re I.W., supra,* 180 Cal.App.4th at p. 1529.) Thus, unless the undisputed facts establish the

existence of a beneficial parental relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed. (*Bailey J., supra,* at p. 1314.)

The second requirement for the exception is that the beneficial parental relationship constitute a "compelling reason for determining that termination would be detrimental …." (§ 366.26, subd. (c)(1)(B); *K.P., supra,* 203 Cal.App.4th at p. 622.) Although grounded in the facts, the court's determination of this issue is a "'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.] Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*Bailey J., supra,* 189 Cal.App.4th at p. 1315; see also *K.P., supra,* at p. 622.)

For instance, when a parent has had custody of the children and visited consistently when he or she did not have custody, and had an established bond recognized by the agency workers, substantial evidence supports the first prong of the application of the statutory exception. (*K.P., supra,* 203 Cal.App.4th at p. 622.) The determination then becomes whether under the facts of the case, there is a compelling reason for the court to order a plan other than adoption, and whether the court abused its discretion in failing to do so. (*Id.* at pp. 622-623.) In simplest terms, the establishment of the beneficial parental bond exception depends upon a parent having developed such a beneficial bond that it would be detrimental to sever it. The benefit from continuing with the parent would outweigh any benefit the child would derive from his or her adoption. (§ 366.26, subd. (c)(1)(B)(i); *Autumn H., supra,* 27 Cal.App.4th at p. 575.)

*Analysis*

14.

There appears to be little dispute between the parties as to whether mother satisfied her burden to establish the first prong of the beneficial parent-child relationship exception – namely, that she "maintained regular visitation and contact" with William. (§ 366.26, subd. (c)(1)(B)(i).) Nevertheless, we do not reach that issue because the juvenile court did not err in concluding mother failed to meet her burden, under the second prong, to show that William would benefit from continuing the relationship with mother. (*Ibid.*)

We note that prior to determining whether the exception applied, the juvenile court appeared unsure of whether the standard the parents[4] were to be held to was one of clear and convincing evidence or a preponderance of the evidence. The court's confusion was complicated further when county counsel assured the court the parents had the burden by clear and convincing evidence. During subsequent argument, county counsel and William's counsel both reiterated that mother and father had not met their burden of proof by clear and convincing evidence that the beneficial parent-child relationship exception applied. As stated above, a parent asserting the parental benefit exception has the burden of establishing that exception by a preponderance of the evidence. (*In re J.C., supra,* 226 Cal.App.4th at p. 529.)

There is no dispute that mother did not object or inform the juvenile court of the correct legal standard of proof. The department urges us to therefore consider the issue forfeited, or, in any event, that it was harmless error. We will address the issue, noting that the application by a fact finder of an incorrect burden of proof does not necessarily compel reversal, because the record may show that the prevailing party would have prevailed even under the proper burden. That is the case here. Even under the correct standard, mother did not present a preponderance of the evidence that William would benefit from maintaining the parent-child relationship as explained more fully below.

---

**4**      Father made a similar argument below.

15.

It is well settled that when reunification efforts have failed, adoption is the Legislature's first choice because it gives the child the best chance at a full emotional commitment from a responsible caregiver. (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) To overcome the preference for adoption and to avoid termination of parental rights, it is the parent who has the burden of showing both regular visitation and contact and the benefit to the child in maintaining the parent-child relationship. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) This requires the parent to prove that severing the natural parent-child relationship would deprive the child of a substantial positive emotional attachment such that the child would be greatly harmed. (*Ibid.*)

In deciding whether the exception applies, the juvenile court must balance the strength and quality of the natural parent-child relationship in a tenuous placement against the security and sense of belonging a new family would confer. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.) Interaction between the natural parent and the child will always confer some incidental benefit to the child. (*Ibid.*) But a showing that the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent is not sufficient where that relationship does not meet the child's need for a parent. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348, 1350.) Significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. The relationship arises from day-to-day interaction, companionship and shared experiences. (*Autumn H., supra,* at p. 575.)

A parent's failure to progress beyond monitored visitation with a child and to fulfill a "meaningful and significant parental role" justifies an order terminating parental rights. (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1109.) "It would make no sense to forgo adoption in order to preserve parental rights in the absence of a real parental relationship." (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1350.)

16.

The exception must be examined on a case-by-case basis, taking into account factors such as: "(1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive and negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Angel B., supra,* 97 Cal.App.4th at p. 467, fn. omitted.) "[F]or the exception to apply, the emotional attachment between the child and the parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt." (*Id.* at p. 468.)

Here, the juvenile court found mother did not serve in a parental role to William, but was instead a "friendly visitor." The juvenile court noted mother did not have custody of William since October of 2012, when she left him at less than a year old with father. At that point, she was given only reasonable supervised visitation by another court. The juvenile court did not think mother had fully internalized an appreciation of her past problems and she does not and "could not possibly manage [William] independently."

The department report prepared for the section 366.26 hearing acknowledged mother was attentive to and appropriate with William at visits and that he referred to her as "mom," but, at the end of each visit, William left willingly with his caregivers. The report described William, who had been with his caregivers for a year and a half, as very comfortable and thriving in his placement. The caregivers were loving and nurturing toward William and provided him with a sense of security and commitment. William had developed a positive parent/child relationship with the caregivers, who wished to adopt him. The report opined that William did not "recognize [mother] as a parental figure," and did not look to her for his daily needs. The report opined that William saw mother "as a friendly visitor rather than a parental figure."

While mother points to a number of circumstances during her visits with William that no doubt reflect mother's love and affection toward him, at this stage of the

17.

proceedings, mother's emotional bond to William is not the issue. (See *In re K.P., supra,* 203 Cal.App.4th at p. 621.) Mother points to little evidence of William's subjective attachment to mother, and what evidence there is does not rise to the level of demonstrating she occupied a """"parental role"""" in William's life. (*Ibid.*) This includes evidence that William called mother "mom," that he was affectionate with her, and that he was comfortable and happy during the visits.

Mother also ignores contrary evidence that affirms the juvenile court's determination: that mother had a difficult time disassociating herself from father, who had abused her and William. And mother ignores the fact that she gave up custody of William when she left him in father's care and, as such, had not had custody of William for most of his short life.

We note that mother's appeal is essentially asking us to reweigh the evidence and to accept her judgment regarding the applicability of this exception to termination of parental rights instead of the judgment of the trial court. We decline to do so. The burden on appeal is on mother to show that the judgment was not supported by substantial evidence and thus demonstrate the beneficial parent-child relationship exception does apply. We conclude mother has failed to do so. While William may have derived some benefit from his relationship with mother, the record does not support a finding that it outweighs the benefit and stability he would derive from adoption, or provide grounds to reverse the sound judgment of the juvenile court.

Lastly, to the extent mother asserts that the juvenile court should have considered guardianship over adoption, we disagree. As stated above, adoption is the preferred permanent plan for children. (*In re Marina S.* (2005) 132 Cal.App.4th 158, 164.) "If a child is likely to be adopted, parental rights must be terminated unless one of several enumerated exceptions applies." (*Ibid.*) Because mother has failed to meet her burden to show exceptional circumstances, we hold that the juvenile court did not err by refusing to apply the beneficial parent-child relationship exception to termination of parental rights.

**DISPOSITION**

The December 18, 2015, order is affirmed.

                                     _____

                                            FRANSON, J.

WE CONCUR:

_____

HILL, P.J.

_____

KANE, J.